## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MORGAN W. COLLIER,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:20cv00027 |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of** | ) | By: Pamela Meade Sargent |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

### I. Background and Standard of Review

Plaintiff, Morgan W. Collier, ("Collier"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is, therefore, substituted for Andrew Saul as the defendant in this case.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Collier protectively filed his application for SSI[2] on October 26, 2017, alleging disability as of October 26, 2017, based on anxiety, depression, back and shoulder pain, post-traumatic stress disorder, ("PTSD"), and obsessive-compulsive disorder, ("OCD"). (Record, ("R."), at 12, 92, 243.) The claim was denied initially and upon reconsideration, (R. at 91-103, 106-24, 131-33, 137-39, 142-43, 145-47, 149-51), after which Collier requested a hearing before an administrative law judge, ("ALJ"). (R. at 152-53.) A video hearing was convened on September 24, 2019, at which Collier was represented by an attorney. (R. at 12, 40-73.)

By decision dated October 15, 2019, the ALJ denied Collier's claim. (R. at 12-33.) The ALJ found that Collier had not engaged in substantial gainful activity since October 26, 2017, the application date. (R. at 14.) The ALJ determined that Collier had severe impairments, namely spine disorders; depressive, bipolar and related disorders; anxiety and obsessive compulsive disorders; and other unspecified arthropathies, but he found Collier did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R.

---

[2] Collier also filed for DIB benefits on this date. (R. at 215-16.) It appears, however, that Collier's insured status expired in September 2013. (R. at 226.)

Part 404, Subpart P, Appendix 1. (R. at 14-18.) The ALJ found Collier had the residual functional capacity to perform light[3] work, except he could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; he could sit, stand and walk for six hours; he could occasionally climb, balance, stoop, kneel, crouch, crawl, work at unprotected heights and interact with supervisors, co-workers and the public; he was able to understand, remember and carry out simple instructions, perform simple, routine and repetitive tasks and make simple work-related decisions; and he could adapt to occasional changes in a customary workplace setting. (R. at 18-31.) The ALJ found Collier was unable to perform his past relevant work. (R. at 31.) Based on Collier's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Collier could perform, including the jobs of an assembler, a packer and an inspector or tester. (R. at 31-32.) Thus, the ALJ concluded Collier was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 33.) *See* 20 C.F.R. § 416.920(g) (2020).

After the ALJ issued his decision, Collier pursued his administrative appeals, (R. at 7-8, 208-11), but the Appeals Council denied his request for a review. (R. at 1-3.) Collier then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2020). This case is before this court on Collier's motion for summary judgment filed April 21, 2021, and the Commissioner's motion for summary judgment filed June 21, 2021.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2020).

*II. Facts*

Collier was born in 1971, (R. at 282), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). He has an 11th-grade education[4] and can read and write. (R. at 46, 47.) Collier has past work experience as a coal truck driver. (R. at 47-48.) At the September 2019 hearing, Collier testified that he had not worked since 2008 because of depression, anxiety and back and shoulder pain, inability to find a job and not having a valid drivers license. (R. at 49.) Collier testified that he was antisocial and had difficulty getting along with others at work. (R. at 49.) Collier said that he was "released" from his last job because her "just couldn't get along." (R. at 49.) He said that he mostly could not get along with supervisors. (R. at 50.)

Collier stated that he suffered from PTSD as a result of witnessing a person shoot himself in 1990. (R. at 51.) Collier stated that he still had nightmares and startled at loud noises. (R. at 51.) Collier said that his psychiatric medications – Prozac, hydroxyzine and trazodone – made him very drowsy. (R. at 52.) Collier also testified that he could not function and felt anxious around crowds. (R. at 53.) Collier said that he suffered from daily, multiple panic attacks, during which his heart raced, he sweated and would shake. (R. at 54.) Collier said that he felt very fatigued, hopeless and sad. (R. at 55.) Collier also testified that he was very forgetful. (R. at 63.) Collier testified that he stopped drinking three years earlier. (R. at 63.)

Collier testified that he had severe pain in his right shoulder, left wrist, neck and lower back. (R. at 56.) Collier said that his right arm was numb between his shoulder and elbow. (R. at 56.) He said that he could not lift his right arm above

---

[4] It appears that Collier did not successfully complete the 11th grade. (R. at 233-34.)

shoulder level. (R. at 59.) Collier said that he had difficulty gripping with his right hand due to shaking. (R. at 57.) Collier said he had pain in his left wrist and trouble gripping with that hand. (R. at 57.) Collier said that his shaking was so bad that he had trouble feeding himself without spilling his food. (R. at 58.) Collier said that his low back pain radiated into a burning sensation in his right buttock. (R. at 59.) Collier testified that he could stand or walk for only 15 to 20 minutes without changing positions. (R. at 60.) Collier said that he spent most of the day lying in bed to get relief from back pain. (R. at 60-61.) He said that, in an eight-hour period, he would lie down six to seven hours. (R. at 61.) Collier said that he could not bend, stoop, squat or kneel. (R. at 61.) Collier said that, if he tried to squat or stoop, he would fall over. (R. at 61.)

John F. Newman, a vocational expert, also testified at Collier's hearing. (R. at 63-72.) Newman's testimony is not outlined here because Collier does not contest the ALJ's finding that other work existed that he could perform, if the ALJ's finding as to his residual functional capacity was supported by the record.

In rendering his decision, the ALJ reviewed records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Dr. Jack Hutcheson, M.D., a state agency physician; Jo McClain, Psy.D., a state agency psychologist; Melinda M. Fields, Ph.D., a licensed psychologist; The Health Wagon; Dr. Kevin Blackwell, D.O.; Crystal Burke, L.C.S.W.; Jody Willis, D. N.P., F.N.P.-B.C.; and Dr. Michael W. Wheatley, M.D.

Dr. Kevin Blackwell, D.O., completed a consultative examination of Collier on October 22, 2014. (R. at 350-53.) Collier complained of depression and shoulder pain. (R. at 350.) He reported he had suffered daily pain in both shoulders for several years, worsening in the previous six months. (R. at 350.) Collier also complained of pain in his left knee and lower back. (R. at 350.) He rated his typical pain as a three or four out of 10.  (R. at 350.) Collier also complained of shortness of breath upon exertion and occasional palpitations in his chest. (R. at 350.) He reported he was taking Prozac and hydroxyzine. (R. at 350.) On examination, Collier did not appear to be in any acute distress, he was cooperative and fully oriented with good mental status, and he had an intact affect, thought content and general fund of knowledge. (R. at 351.) Collier exhibited good inspiratory and expiratory effort and no labored breathing. (R. at 351.) His lungs were clear to auscultation, and his heart rate and rhythm was regular without murmurs, clicks or rubs. (R. at 351.) Dr. Blackwell noted crepitus in Collier's shoulders, bilaterally, with some tenderness to palpation anterior and posterior; tenderness along the left knee region and in the lumbar muscles; his gait was symmetrical and balanced; his shoulder and iliac crest heights were good and equal, bilaterally; upper and lower joints had no effusions or obvious deformities; and upper and lower extremities were normal for size, shape, symmetry and strength. (R. at 351-52.) Collier's grip strength was good at 5/5 and equal, bilaterally; his fine motor movement and skill activities of his hands were normal; and his reflexes in his upper and lower extremities were good and equal, bilaterally, at 4/4. (R. at 352.)

Based on his examination, Dr. Blackwell opined that Collier could sit six hours and stand two hours in an eight-hour workday, assuming normal positional changes. (R. at 352.) He found Collier should avoid above head reaching with both arms, crouching, crawling, squatting, work at unprotected heights and repetitive or

continuous stair climbing. (R. at 352-53.) He found Collier could operate foot pedals and kneel up to one-third of the workday. (R. at 352, 353.) He stated that Collier could occasionally lift 40 pounds and frequently lift 15 pounds, and he noted no visual, communicative, hearing or environmental limitations. (R. at 352.) Dr. Blackwell stated he saw no limitation of hand usage, including fine motor movement and skill activities of the hands. (R. at 353.) Dr. Blackwell completed and Range of Motion Form stating that Collier's ranges of motion all were within normal limits. (R. at 349.)

On May 8, 2017, Collier saw Ramona Boyd, N.P., with The Health Wagon to reestablish care after a four-year absence. (R. at 471-72.) Collier gave a history of back and right hip pain. (R. at 471.) He said that he had pain in his right shoulder and neck and had "right rotator cuff issues." (R. at 471.) Collier said that his back and right ribs hurt to even touch them; he said that he had tried over-the-counter Motrin and Tylenol, but was afraid to take too much due to renal and liver issues. (R. at 471.) On examination, Boyd noted that Collier was in no acute distress, his heart had no murmurs and had a regular rate and rhythm. (R. at 471.) Collier denied any chest pain, shortness of breath or palpitations. (R. at 472.) Collier was tender to palpation in his cervical and lumbar spine. (R. at 471.) He had normal motor strength in all extremities. (R. at 471.) Collier denied any tremor, numbness or tingling or loss of use of his extremities. (R. at 472.)

On depression screening, Collier stated that he had been bothered in the previous two weeks by little interest or pleasure in doing things, as well as feeling down, depressed and hopeless, but he denied thinking he would be better off dead or of hurting himself in any way. (R. at 471.) Surprisingly, Boyd, at another point, noted that Collier denied any anxiety or depressed mood. (R. at 472.) Collier stated

that he previously had taken Prozac and Vistaril, but they made him really sleepy because he thought the dosage was too strong. (R. at 471.) On examination, Collier was alert, oriented, and his cognitive function was intact. (R. at 471.) Collier denied any irritability or memory loss. (R. at 472.) Boyd diagnosed cervicalgia; other intervertebral disc disorder, lumbar region; and major depressive disorder, recurrent, moderate. (R. at 471.)

Collier called Boyd seeking a prescription for Prozac on August 23, 2017. (R. at 469.) Collier stated that he had been seen at the Remote Area Medical Clinic, ("RAM"), and needed a referral for psychiatric telehealth. (R. at 469.)

Collier had an MRI of his lumbar spine with contrast performed on September 29, 2017. (R. at 488-89.) Radiologist Dr. Dennis Halbert, M.D., stated that the MRI showed some mild degenerative changes in the anterior cephalad corners of all his lumbar vertebrae, with slightly narrowed disc space at the L5-S1 level, minimal central disc herniation at the L4-L5 level and very mild degenerative changes throughout the lumbar region. (R. at 488.)

Collier saw Boyd again on May 9, 2018, for the results of his September 2017 MRI. (R. at 481.) Collier complained of swelling and burning under his right arm, pain in his right shoulder, painful joints and muscle aches. (R. at 481.) Collier denied being bothered by little interest or pleasure in doing things or feeling down, depressed or hopeless, but he complained of anxiety, depressed mood and loss of appetite. (R. at 481.) Collier admitted that he was not taking his Prozac or Vistaril. (R. at 482.) On examination, Collier's neck was supple with full range of motion, there was no costovertebral angle tenderness in his back, the examination of his lumbosacral spine was normal, he had normal motor strength in all extremities, and

he was alert and oriented, but anxious appearing. (R. at 482.) Boyd diagnosed low back pain and muscle spasm, even though her exam notes made no mention of any spasm, and she prescribed Flexeril. (R. at 482.)

Dr. Blackwell performed another consultative examination of Collier, at the state agency's request, on June 14, 2018. (R. at 512-15.) Dr. Blackwell noted that Collier's chief complaints were anxiety, depression, back and shoulder problems and OCD. (R. at 513.) In particular, Collier complained of persistent, ongoing worsening pain in his back for "many years." (R. at 513.) He claimed that the pain in his lower back radiated into his neck. (R. at 513.) Collier also complained of pain around his left shoulder blade with persistent, ongoing numbness in his left arm and constant pain in his right shoulder, which worsened when he tried to use it. (R. at 513.) He said this pain worsened if he moved his neck forward. (R. at 513.) Collier reported that an MRI of his lower back showed a disc herniation at the L4-L5 level. (R. at 513.) He also complained that sitting bothered his back and shoulder region, and he ranked his pain as, typically, a five to six on a 10-point scale. (R. at 513.)

On examination, Collier did not appear to be in any acute distress and was alert, cooperative and fully oriented with good mental status. (R. at 513.) His affect, thought content and general fund of knowledge appeared intact. (R. at 513.) Collier's neck was supple and nontender with no nuchal rigidity; and his trapezius muscles, both right and left, were tender, as were the paraspinal muscles of his cervical, thoracic and lumbar regions. (R. at 513.) Collier also had tenderness with abduction and forward flexion of his right shoulder. (R. at 513.) His gait was symmetrical and balanced; his shoulders and iliac crest heights were good and equal bilaterally; his upper and lower extremity joints were without effusions or obvious deformities; his upper and lower extremities were normal for size, shape, symmetry and strength; his

grip strength was good at 5/5 and equal, bilaterally; his fine motor movement skills and activities of the hand appeared normal; and his reflexes in his upper and lower extremities were good and equal, bilaterally. (R. at 514.)

Based on his examination, Dr. Blackwell opined that Collier could sit for four hours and stand for two to four hours in an eight-hour workday with positional changes every five minutes. (R. at 515.) He further opined that Collier could lift up to 25 pounds with frequent lifting of 10 pounds. (R. at 515.) Dr. Blackwell found that Collier should avoid overhead reaching activities with his right arm and could overhead reach with his left arm one-third of the workday. (R. at 515.) He placed no limitation on Collier's hand usage, including fine motor movement skill activities of the hands, stating that Collier's gross hand usage was normal. (R. at 515.) Dr. Blackwell opined that Collier could not crouch, crawl, work around unprotected heights, squat or climb stairs repetitively or continuously. (R. at 515.) He found that Collier could occasionally kneel and had no vision, communication, hearing or environmental limitations. (R. at 515.) Dr. Blackwell stated that Collier's ranges of motion in his spine and all joints were normal. (R. at 512.)

Collier began mental health treatment with Crystal Burke, L.C.S.W., with Appalachia Family Health, on March 27, 2018. (R. at 525-27.) Collier reported that he quit school in the 11th grade and had not worked since 2008. (R. at 525.) He said he lived in a camper near his father's home. (R. at 525.) Collier said he last worked for six months driving a hauler, but it made him too anxious, so he quit. (R. at 525.) Collier admitted that his work record was very "sporadic." (R. at 525.) He reported that he often had to check things or rearrange objects in his home. (R. at 525.) He said that he could not step on cracks and, if he touched something with one hand, he had to touch it with his other hand, too. (R. at 525.) Collier said that he did not like

to be around people who were eating or sick. (R. at 525.) He said that someone was coughing in Burke's lobby area, and he moved away because he was afraid he might catch a bad germ. (R. at 525.) Collier said he had been prescribed Prozac and Vistaril, but he was not taking them daily because they made him too sleepy. (R. at 525.)

Collier denied any thoughts of harming others or himself, but he stated: "If I ever want to feel this way, it is my right and my decision." (R. at 525.) Collier reported a history of heavy alcohol use, years ago, and he admitted that he continued to have a "cold beer on occasion." (R. at 525.) He complained of pain in his spine and shoulders and tremors in his hands. (R. at 525.) Burke noted these tremors in both hands, but Collier reported he had not told his medical providers about them. (R. at 525.) Collier reported that his mother had died in November, which had been very difficult for him. (R. at 525.) He said he worried about his father and his grief. (R. at 525.) Collier became tearful speaking of his mother's death. (R. at 525.) He said he was upset with his older sisters because they came into his parents' home and packed up his mother's belongings after her death. (R. at 525.) Collier said he had not spoken to his sisters since this occurred. (R. at 525.) He stated he was worried what would happen to him if his father died. (R. at 525.)

Burke stated Collier appeared depressed with the loss of his mother. (R. at 525.) She noted that Collier was cooperative and appeared genuine in presentation. (R. at 525.) On mental status examination, his appearance/grooming was disheveled; his mood and affect were anxious; his eye contact was adequate; he was oriented to place, person and situation; his thought process was scattered; he had no paranoia or delusions; and his judgment and insight were fair. (R. at 527.) Burke diagnosed major depressive disorder, single episode, severe without psychotic features; and

- 11 -

anxiety disorder, unspecified. (R. at 526.) She noted she needed to rule out OCD or obsessive-compulsive personality disorder. (R. at 525.)

On April 26, 2018, Collier returned to Burke for counseling. (R. at 522-24.) He continued to report depressive symptoms and problems with anxiety and worry and problems sleeping. (R. at 522.) Burke noted that Collier appeared anxious and ruminated on his mother's death and his sisters' actions afterward. (R. at 522.) He was tearful discussing his mother's death and was very concerned about his father. (R. at 522.) On mental status examination, Collier's appearance/grooming was casual; his mood was mixed; and his affect was labile; his eye contact was adequate; he arrived at his appointment on time; his thought process was rambling; he had no paranoia or delusions; and his judgment and insight were fair. (R. at 522-23.) Burke's diagnoses remained unchanged. (R. at 522.)

When Collier returned to see Burke on June 13, 2018, he reported he had received a little relief with a recent prescription of a muscle relaxant. (R. at 529.) Collier stated that he was taking his Prozac and Vistaril again, but he continued to report problems around the public and crowds, problems with sleep and that he had lost interest in all activities. (R. at 529.) He reported that he was still very anxious, worried most of the time and was obsessing and frequently checking on or sequencing things. (R. at 529.) Collier reported he was doing better with grief and that therapy was helping him work through it. (R. at 529.) He stated he had tried to obtain insurance, but he needed some additional paperwork, which he did not pursue. (R. at 529.) Collier said paperwork was confusing to him, and he would lose interest and procrastinate. (R. at 529.)

Burke noted Collier appeared both anxious and depressed in mood, and he reported several depression symptoms. (R. at 529.) He continued to report being mostly withdrawn and eating only once a day. (R. at 529.) On mental status examination, Collier's appearance/grooming was casual; his mood was mixed, and his affect was anxious; his eye contact was adequate; he arrived at his appointment on time; he was alert and fully oriented; his thought process was intact; he had no paranoia or delusions; and his judgment and insight were fair. (R. at 531.)

Burke completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on Collier on June 21, 2018. (R. at 517-19.) She opined Collier had a moderate, or more than slight, limitation, but still was able to function satisfactorily, in his ability to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 517-18.) Burke opined Collier had a marked limitation, or substantial loss in his ability to effectively function, resulting in unsatisfactory work performance, in making all other occupational, performance and personal/social adjustments. (R. at 517-18.) Burke further opined that Collier could not manage benefits in his own best interest and would be absent from work more than two days a month due to his impairments or treatment. (R. at 519.) Burke did not list any findings that supported her assessment. (R. at 517-19.)

On June 25, 2018, state agency psychologist Howard S. Leizer, Ph.D., completed a Psychiatric Review Technique form, ("PRTF"), in connection with the initial consideration of Collier's claim. (R. at 97.) Leizer opined Collier suffered no limitation in his ability to understand, remember or apply information, to interact with others, to concentrate, persist or maintain pace or to adapt or manage himself. (R. at 97.) He concluded that Collier's mental impairments did not meet or equal the

listed impairments found at § 12.04 for depressive, bipolar and related disorders or § 12.06 for anxiety and obsessive-compulsive disorders. (R. at 97.) Leizer stated that the medical evidence did not show severe limitations due to Collier's anxiety and depression. (R. at 97.) Thus, he opined that Collier had a non-severe mental health impairment. (R. at 97.)

On June 26, 2018, Dr. Bert Spetzler, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment in connection with the initial consideration of Collier's claim. (R. at 99-100.) Dr. Spetzler opined Collier could occasionally lift and carry up to 20 pounds and frequently lift and carry 10 pounds. (R. at 99.) He found Collier could stand and/or walk and sit about six hours in an eight-hour workday. (R. at 99.) Dr. Spetzler opined Collier's ability to push and/or pull was limited to frequent in both upper extremities due to cervical and shoulder tenderness. (R. at 99.) He found Collier could occasionally climb ramps/stairs, stoop, kneel, crouch, crawl and climb ladders and never climb ropes or scaffolds. (R. at 100.) Dr. Spetzler opined Collier's ability to balance was unlimited, and he imposed no manipulative, visual, communicative or environmental limitations. (R. at 100.)

Collier returned to see Burke on July 16, 2018, reporting he was feeling down and out and felt that way most of the time. (R. at 532.) He reported he was not sleeping well, sleeping only about two hours a night with frequent awakening. (R. at 532.) Collier reported he was taking his Prozac, but he did not think it was very helpful. (R. at 532.) He also reported problems concentrating and not eating. (R. at 532.) He said he was having a terrible time getting over his mother's death. (R. at 532.) He said his mother's summer flowers were in full bloom in the yard, and he missed her. (R. at 532.) Collier said he was very anxious and itching and feeling like

he had bugs all over his body because he found a tick crawling on his arm on the ride to his appointment. (R. at 532.) Burke noted Collier was actively looking for ticks on his arms, trunk and shoes and seemed very anxious about it. (R. at 532.) She noted he was having a difficult time concentrating during the session. (R. at 532.)

On mental status examination, Collier's appearance/grooming was casual; his mood and affect were anxious; his eye contact was adequate; he arrived at his appointment on time; he was easily distracted; his thought process was distractable; he had no paranoia or delusions; and his judgment and insight were limited. (R. at 533.) Collier denied suicidal ideations, but he stated he did not care if he lived or died. (R. at 533.)

On September 5, 2018, Jo McClain, Psy.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Collier's claim. (R. at 114-15.) McClain opined Collier suffered moderate limitation in his ability to understand, remember or apply information, to interact with others, to concentrate, persist or maintain pace and to adapt or manage himself. (R. at 114.) She concluded Collier's mental impairments did not meet or equal the listed impairments found at § 12.04 for depressive, bipolar and related disorders or § 12.06 for anxiety and obsessive-compulsive disorders. (R. at 114-15.) McClain opined Collier's anxiety and depression were severe, but caused no more than moderate limitations. (R. at 115.) McClain further opined Collier remained capable of completing simple and routine work-related tasks over the course of a 40-hour workweek with eight-hour workdays. (R. at 115.)

McClain also completed a Mental Residual Functional Capacity Assessment on September 5, 2018. (R. at 118-20.) McClain opined Collier's ability to

understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted; to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to set realistic goals or make plans independently of others were moderately limited. (R. at 119-20.) All other areas of understanding and memory, sustained concentration and persistence social interaction and adaptation were deemed not significantly limited. (R. at 119-20.)

McClain opined Collier remained capable of completing a 40-hour workweek with eight-hour workdays while completing simple, routine or repetitive work-related tasks, but likely would struggle with the demands of completing more complex and/or detailed tasks in a competitive work environment. (R. at 119-20.) She also opined he retained the ability to maintain concentration and attention for two-hour periods with normal breaks over the course of an eight-hour workday and 40-hour workweek and was capable of interacting and relating to others appropriately, but he would do better in a well-spaced location with infrequent co-worker interaction. (R. at 120.) McClain opined Collier was capable of interacting with the public on an infrequent basis and was able to get along with co-workers, but due to distractions, would do best in a well-spaced work setting. (R. at 120.) McClain said that Collier likely would benefit from some infrequent assistance with setting realistic goals and/or making plans independently of others. (R. at 120.)

On September 7, 2018, Dr. Jack Hutcheson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment in connection with the reconsideration of Collier's claim. (R. at 117-18.) Dr. Hutcheson opined Collier could occasionally lift and carry up to 25 pounds and frequently lift and carry 25 pounds. (R. at 117-18.) He further opined that Collier could stand and/or walk and sit more than six hours on a sustained basis in an eight-hour workday. (R. at 118.) Dr. Hutcheson found that Collier's ability to push and/or pull was unlimited, other than as stated for lifting and carrying. (R. at 118.) He imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 118.)

Dr. Hutcheson stated that Collier remained neurologically intact, and his limitations were due to subjective complaints of pain. (R. at 118.) He noted that Collier's June 2018 physical examination showed that he retained full strength and range of motion throughout his extremities; his gait was normal, symmetrical and balanced; he had subjective tenderness; his grip strength was 5/5; his motor skills and lumbar range of motion were within normal limits; and his right shoulder range of motion and strength remained full. (R. at 118.)

Collier saw Jody Willis, D.N.P., F.N.P.-B.C., with Appalachia Family Health, on January 23, 2019, stating, "my lawyer advised me to see the doctor because I am trying to get my disability." (R. at 538.) Collier complained of his right shoulder burning and radiating down towards his elbow, chronic neck pain radiating down his right arm at times and pain in his hands. (R. at 538.) Collier reported his aching joint pain started several years earlier and had progressively worsened; he denied joint swelling, changes or erythema. (R. at 538.)

Collier reported he was taking Prozac, which was controlling his anxiety symptoms. (R. at 538.) He denied any weight gain or loss, fatigue, headaches, loss of appetite, back pain, joint stiffness or limitation of movement, muscle pain or weakness, tingling, paresthesia or numbness, local weakness, depression or anxiety. (R. at 539-40.) On exam, Collier was in no acute distress and alert. (R. at 540.) His neck was symmetric and supple with no tenderness on palpation, his gait was normal, and his motor examination revealed normal tone, bulk and strength. (R. at 540.) Collier was oriented to time, place and person with a euthymic mood and appropriate affect. (R. at 540.)

Collier also saw Burke on January 23, 2019, reporting he had missed his last appointment because he was not on speaking terms with his father, who provides his transportation, because his father ran over Collier's dog. (R. at 548.) Collier stated he became very depressed for a couple of months over this, feeling as if he could not even function. (R. at 548.) He complained of staying nervous and "jerking himself awake all night long." (R. at 548.) Collier reported concentration problems and an inability to remember simple things. (R. at 548.) He complained of hand tremors and problems with his spine. (R. at 548.) Burke noted that Collier appeared anxious, but was calm and cooperative. (R. at 548.) His speech was normal, and he was somewhat scattered in his thoughts, but he had no delusions or thought disturbance. (R. at 548.) Burke noted that Collier did not appear to cope well with normal stress. (R. at 548.)

Collier saw Dr. Michael W. Wheatley, M.D., with Wellmont Medical Associates, on June 17, 2019, for a complaint of back pain and requesting an MRI. (R. at 564.) Collier complained of constant, moderate to severe pain in his lumbar spine, which did not radiate. (R. at 566.) He rated his pain as a four on a 10-point scale. (R. at 566.) He said his symptoms were aggravated by position. (R. at 566.)

He said he had occasional leg pain, but he denied any bladder or bowel incontinence, numbness or weakness. (R. at 566.) Collier said that he had taken anti-inflammatory medication and muscle relaxants with moderate relief. (R. at 566.) Collier also complained of sharp, severe pain in and burning under his right shoulder blade with swelling and limited range of motion. (R. at 565, 566.) He also complained of depressed mood, insomnia, anxiety, racing thoughts, periods of euphoria and social difficulties, but he denied any fatigue, poor concentration, appetite change, weight loss, headaches, irritability or periods of excessive energy. (R. at 566.) Collier reported that his depression was constant and severe and worsened by emotional stress. (R. at 566.)

In his Review of Systems, Dr. Wheatley noted all negative findings, including no back pain, joint swelling, weakness or numbness. (R. at 567.) He did note that Collier was positive for depression and insomnia, but negative for confusion, dysphoric mood and suicidal ideas. (R. at 567.) He specifically noted that Collier was not nervous/anxious. (R. at 567.) On physical exam, Collier was fully oriented; his neck was supple with normal range of motion; he exhibited no musculoskeletal tenderness; and he had a normal mood, affect and behavior. (R. at 568.) Dr. Wheatley diagnosed primary osteoarthritis involving multiple joints; severe episode of recurrent major depressive disorder, without psychotic features; and tremor. (R. at 564.)

Collier saw Burke again on June 20, 2019, reporting that Dr. Wheatley had increased his Prozac and Vistaril dosages, but stating, "I'm still a nervous wreck." (R. at 583.) He complained of recurrent dreams over witnessing a friend's suicide years earlier. (R. at 583.) Collier said he was sad over the recent death of a pet cat. (R. at 583.) He also said he feared that he would never get over his mother's death.

(R. at 583.) Collier said he remained isolated and withdrawn most days. (R. at 583.) He stated that his medication had helped with racing thoughts, but he said he sometimes felt paranoid in public. (R. at 583.) Burke noted that Collier had missed several appointments, and Collier complained that he was having a difficult time following through on tasks. (R. at 583.) Burke noted that Collier was having a difficult time coping. (R. at 583.) On mental status exam, Collier's appearance/grooming was casual; his mood and affect were anxious; eye contact was appropriate; his thought process was scattered; he had no paranoia or delusions; and his insight and judgment were fair. (R. at 586-87.)

July 2, 2019, x-rays of Collier's cervical spine revealed no acute findings, with no acute bony lesions, and mild degenerative disc disease at the C4-C5 level with facet arthropathy. (R. at 574-75.) July 2, 2019, x-rays of Collier's lumbar spine revealed no acute findings, with no acute bony lesions, mild degenerative disc changes at the L3-L4 level, facet arthropathy at the L4-L5 level and calcific changes of the aorta and iliac arteries. (R. at 576-77.)

Collier saw Burke again on July 23, 2019. (R. at 578-82.) He reported that he believed taking Prozac had helped with his depression and anxiety, but he stated he had run out of his medication recently. (R. at 578.) Collier stated he still had a hopeless feeling nearly every day with worry and a sense of dread, but he denied thoughts of harm to himself or others. (R. at 578.) He complained of problems with his concentration and "forgetting little things." (R. at 578.) On mental status exam, Collier's appearance/grooming was casual; his mood and affect were mildly anxious; eye contact was adequate; he was oriented in all spheres; his thought process was scattered; he had no paranoia or delusions; and his insight and judgment were fair. (R. at 581.)

- 20 -

Collier returned to see Dr. Wheatley on August 7, 2019, complaining of aching, shooting, moderate pain in his anterior neck, which was aggravated by coughing. (R. at 589.) He denied any leg pain, numbness, paresis or weakness. (R. at 589.) Collier said anti-inflammatory and muscle relaxant medication had provided moderate relief. (R. at 589.) Collier complained of intermittent, moderate, aching pain in his lumbar and thoracic spine, radiating into his left foot. (R. at 589.) He said that his symptoms were aggravated by bending or position, but he denied any bladder or bowel incontinence, leg pain, numbness, paresis or weakness. (R. at 589.) Dr. Wheatley noted that Collier's blood pressure was high at 148/92. (R. at 589, 591.)

In his Review of Systems, Dr. Wheatley noted all negative findings, including no back or neck pain, joint swelling, weakness or numbness. (R. at 590-91.) He also noted that Collier was negative for confusion, dysphoric mood, suicidal ideas and nervousness or anxiety. (R. at 591.) On physical exam, Collier was fully oriented; his neck was supple with normal range of motion; he exhibited no musculoskeletal tenderness and normal range of motion; and he had a normal mood, affect and behavior. (R. at 591.) Dr. Wheatley diagnosed primary osteoarthritis involving multiple joints; major depressive disorder, recurrent episode; arthritis of the cervical spine; osteoarthritis of the lumbar spine; and right hand tremor. (R. at 592-93.)

On September 5, 2019, Melinda M. Fields, Ph.D., performed a consultative psychological evaluation of Collier. (R. at 596-602.) Collier reported he lived in a camper beside his father's house. (R. at 596.) Fields noted that a review of records from The Health Wagon from 2013 to 2018, Dr. Blackwell in October 2014 and June 2018, Appalachia Family Health Services from 2018 and Stone Mountain Health Services from January 2019, revealed a history of heart palpitations, chest pain, chronic back pain, right hip pain, bilateral shoulder pain, left knee pain,

shortness of breath, dizziness/fainting, nervousness, loss of appetite, anxiety and depression. (R. at 596.) She stated that Collier's assessment/diagnoses included low back pain, other chronic pain, muscle spasms, cervicalgia, other intervertebral disc disorder-lumbosacral region, essential hypertension, alcoholism, unspecified anxiety state, OCD and major depressive disorder, recurrent, moderate. (R. at 596-97.) Fields also reviewed an October 27, 2014, psychological evaluation from Elizabeth Jones, M.A., a licensed senior psychological examiner, records from James Kegley's mental health treatment in 2015 and a medical assessment of Collier's work-related mental activities, completed by Burke on June 21, 2018. (R. at 597.)

Collier reported a history of herniated discs and chronic pain in his lower back. (R. at 597.) He said he had been diagnosed with osteoarthritis and tinnitus. (R. at 597.) Collier said he had a "burning sensation" under his right shoulder blade and numbness and pain of the right arm. (R. at 597.) He said he had experienced a head injury with possible loss of consciousness and concussion during a physical altercation "years ago." (R. at 597.) Collier reported he began using alcohol in adolescence and previously consumed alcohol daily until approximately four to five years earlier. (R. at 597.) Collier said he previously was dependent on alcohol, but he denied then current dependence. (R. at 597.) He reported a prior use of marijuana, with his last use "years ago." (R. at 597.) Collier said he had three prior driving under the influence convictions and had been adjudicated a habitual offender and three or four prior intoxicated in public convictions. (R. at 597.)

Collier reported he went "ballistic" a year earlier when he had witnessed his father run over and kill his dog, resulting in his father calling law enforcement officials. (R. at 598.) Collier claimed he was committed to inpatient psychiatric

treatment on a temporary detention order at the time. (R. at 598.) He reported initial depression and anxiety-related symptoms in childhood. (R. at 598.) He said he experienced daily depressed mood and crying "over nothing." (R. at 598.)  Collier said he lacked motivation and had lost interest in activities previously providing pleasure, and he felt hopeless, with low self-esteem, irritability, difficulty concentrating and making decisions, being withdrawn and having insomnia and difficulty falling asleep after awakening. (R. at 598.) He described his appetite as inconsistent, reporting he had gained 25 pounds over the prior two years. (R. at 598.) Collier related recent passive suicidal ideations, although he denied plan or intent. (R. at 598.) He also denied homicidal ideations and psychotic processes. (R. at 598.)

Collier gave a history of nervousness, nail biting and worry, as well as a need to "repeat things" and check repeatedly. (R. at 598.) Collier said, "if I hit my elbow on something, I have to hit the other elbow the same way." (R. at 598.) He said he was unable to tolerate certain sounds, and "I can't stand watching someone eat." (R. at 598.) Collier identified obsessions, including themes of contamination, aggression, sexuality, hoarding, superstition and religion. (R. at 598.) He reported compulsive behaviors, including washing, checking, counting and arranging. (R. at 598.) Collier related a history of inattention, hyperactivity and impulsivity, starting in early childhood. (R. at 598.) He said, "I've never been able to sit still. … I've always been fidgety," and in school "they said I was hyper, but they just thought it was because I was mean and I have a problem with authority." (R. at 598.) Collier said he was retained in the fifth grade. (R. at 598.) He reported he had worked as a laborer in logging and operated heavy equipment and was last employed driving a truck in 2008. (R. at 599.) Collier reported drinking on the job because he was "afraid I was going [to] wreck," and he was terminated. (R. at 599.)

Collier reported he was the third of three children, and he "can't stand" his sisters. (R. at 599.) He said he had not talked with his sisters since his mother's memorial service in 2017. (R. at 599.) Collier reported going to bed between 10 and 11 p.m., although he said he was unable to fall asleep at that time, and rising by 5 a.m. and being unable to return to sleep. (R. at 599.) He said he spent his time alone and occasionally watched movies on a DVD player. (R. at 599.) He said he had lost interest in his hygiene because he did not care what he looked like. (R. at 599.) Collier said his father would take him to the store, and he was able to prepare convenience foods. (R. at 599.) He said he cleaned his camper and washed his laundry, he denied visiting others, he had stopped attending church due to lack of motivation, and he described his social functioning as impaired. (R. at 599.)

Fields noted that Collier was dressed casually, with fair hygiene and grooming. (R. at 600.) No disturbance of visual or auditory acuity was noted. (R. at 600.) Collier was cooperative and appeared to expend adequate effort during the mental status examination, administration of intellectual testing and completion of assessment inventories. (R. at 600.) Collier had adequate eye contact; was fully oriented; provided responses in a relevant and coherent fashion; his mood appeared anxious and depressed, as evidenced by bitten fingernails, hand tremors and facial expression; affect was mood congruent; stream of thought appeared organized and logical with no evidence of a thought content impairment or perceptual disturbances, such as hallucinations or delusions; judgment appeared impaired; immediate memory appeared within normal limits; and recent and remote recall appeared impaired. (R. at 600.) Collier's posture appeared within normal limits with a slow gait, and he appeared to experience difficulty standing from a seated position. (R. at 600.)

Fields administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Collier achieved a full-scale IQ score of 85, which classified him in the low average range of intelligence. (R. at 600-01.) The Yale-Brown Obsessive Compulsive Scale was completed, with endorsements in the areas of contamination obsessions, aggressive obsessions, sexual obsessions, religious obsessions, washing/cleaning compulsions, checking compulsions, counting compulsions and ordering/arranging. (R. at 601.) The Beck Depression Inventory, ("BDI"), was completed, and the results were suggestive of significant depressive symptomatology. (R. at 601.) The Beck Anxiety Inventory, ("BAI"), was completed and revealed significant anxiety-related symptoms. (R. at 602.)

Fields diagnosed Collier with major depressive disorder, recurrent, severe without psychotic features; OCD; rule out attention-deficit /hyperactivity disorder, ("ADHD"); and alcohol use disorder, by history. (R. at 602.) Fields stated Collier's prognosis appeared guarded with appropriate treatment and environmental support. (R. at 602.) Fields recommended ongoing participation in outpatient psychiatric treatment and regular psychotherapy to reduce and stabilize presentation of mental health symptoms. (R. at 602.)

Fields also completed a mental assessment of Collier, finding he was moderately limited – had more than a slight limitation, but still was able to function satisfactorily – in his ability to follow work rules, to interact with supervisors, to understand, remember and carry out simple instructions, to maintain personal appearance and to demonstrate reliability; and markedly limited in his ability to relate to co-workers, to deal with public, to use judgment in public, to deal with work stressors, to function independently, to maintain attention/concentration, to understand, remember and carry out complex and detailed, but not complex,

instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 603-04.) She stated her findings were supported by Collier's impaired recent and remote recall, impaired concentration, impaired judgment, impaired social functioning, impaired memory, major depressive symptoms and obsessive-compulsive behavior. (R. at 604-05.) Fields opined Collier would miss more than two days of work a month due to his impairments or treatment. (R. at 605.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2020). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*,

715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Collier argues the ALJ erred by improperly determining Collier's residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Collier argues that the ALJ's residual functional capacity finding is not supported by the substantial evidence of record. (Plaintiff's Brief at 5-6.) Lastly, Collier argues the ALJ erred in his consideration of the evidence, particularly, the opinions of Burke and consultative examiners Fields and Dr. Blackwell. (Plaintiff's Brief at 5-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18,

2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 416.920c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[5]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 416.920c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or

---

[5] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5) (2020).

prior administrative medical findings. 20 C.F.R. § 416.920c(b)(2) (2020).[6] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. §416.920c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature

---

[6] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §, 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(2).

and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 416.920c(b)(3), (c)(3)-(5).

As stated above, Collier argues the ALJ erred by improperly determining his residual functional capacity by failing to properly evaluate the opinions of Burke and consultative examiners Fields and Dr. Blackwell. (Plaintiff's Brief at 5-6.)  A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 416.945(a) (2020). The residual functional capacity assessment is based on all the relevant evidence, including the medical records, medical source opinions and the individual's subjective allegations and description of his own limitations. *See* 20 C.F.R. § 416.945(a)(3) (2020).

The ALJ found Collier had the physical residual functional capacity to perform light work, except he could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; he could sit, stand and walk for six hours; he could occasionally climb, balance, stoop, kneel, crouch, crawl, and work at unprotected heights. The ALJ placed no restrictions on Collier's ability to reach overhead or push and pull with his upper extremities. In reaching this finding, the ALJ found Dr. Blackwell's 2014 opinion as to Collier's residual functional capacity "not persuasive because it was less restrictive than warranted by the medical evidence of record." (R. at 27.) Additionally, the ALJ pointed out that Dr. Blackwell's 2014 assessment was written three years before Collier's alleged onset of disability. (R. at 27.) With regard to Dr. Blackwell's 2018 assessment, the ALJ found it not persuasive "because it was an overestimate of his restrictions or limitations." (R. at 27.) In addition, with regard to both Dr. Blackwell's 2014 and

- 30 -

2018 assessments, the ALJ noted that Dr. Blackwell did not regularly treat Collier or have access to his medical records created after the dates of his assessments. (R. at 27, 28.) On the other hand, the ALJ found Dr. Spetzler's opinion persuasive because it was generally consistent with the medical evidence of record. (R. at 24.)

While Dr. Spetzler's June 26, 2018, Physical Residual Functional Capacity Assessment, in large part, supports the ALJ's physical residual functional capacity finding, it varies in one important area – the use of Collier's upper extremities. Dr. Spetzler opined that Collier's ability to push and/or pull was limited to frequent in both upper extremities due to cervical and shoulder tenderness. (R. at 99.) In 2018, Dr. Blackwell also placed restrictions on Collier's ability to use his upper extremities, in that he found Collier should avoid overhead reach activities with his right arm and could overhead reach with his left arm one-third of the workday. (R. at 514.) Despite these limitations, the ALJ did not find that Collier had any severe shoulder impairment.

Granted, the current regulations give great deference to the ALJ's consideration of the medical opinion evidence. Nonetheless, the regulations still require that the ALJ's findings must be supported by substantial evidence. Here, the ALJ stated that he found Dr. Spetzler's opinion regarding Collier's physical residual functional capacity persuasive, yet he did not adopt it in its entirety. Without any explanation of why he rejected Dr. Spetzler's opinion as to limitations on the use of Collier's upper extremities, this court cannot determine whether substantial evidence supports his decision.

Regarding Collier's mental residual functional capacity, the ALJ found Collier was able to understand, remember and carry out simple instructions, perform

simple, routine and repetitive tasks, make simple work-related decisions, could adapt to occasional changes in a customary workplace setting and occasionally interact with supervisors, co-workers and the public. (R. at 18.) In reaching this conclusion, the ALJ did not find Burke's and Fields's opinions as to Collier's mental residual functional capacity persuasive because they were more restrictive than warranted by the psychiatric evidence of record. (R. at 28.) The ALJ noted that Burke appeared to base her assessment heavily on Collier's subjective reports. (R. at 28.) The ALJ also noted that Fields examined Collier only once and had no long-term treating relationship with him. (R. at 29.) The ALJ also rejected the opinion evidence from state agency psychologist Leizer. (R. at 25.) The ALJ stated that Leizer's opinion that Collier did not suffer from a severe mental impairment and had no restrictions on his mental work-related abilities was not persuasive because it was less restrictive than warranted by the evidence of record. (R. at 25.)

The ALJ found that the opinion evidence from state agency psychologist McClain was persuasive because it was generally consistent with the evidence of record. (R. at 25.) McClain opined that Collier remained capable of completing simple and routine work-related tasks over the course of a 40-hour workweek with eight-hour workdays. (R. at 115.) McClain stated that Collier's ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted; to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to set realistic goals or make plans independently of others were moderately limited. (R. at 119-20.)

McClain opined that Collier's ability to perform all other mental work-related activities was not significantly limited. (R. at 119-20.)

McClain opined Collier remained capable of completing a 40-hour workweek with eight-hour workdays while completing simple, routine or repetitive work-related tasks with infrequent interruptions from his mental health symptoms, but likely would struggle with the demands of completing more complex and/or detailed tasks in a competitive work environment. (R. at 119-20.) She also opined he retained the ability to maintain concentration and attention for two-hour periods with normal breaks over the course of an eight-hour workday and 40-hour workweek and was capable of interacting and relating to others appropriately, but he would do better in a well-spaced location with infrequent co-worker interaction. (R. at 120.) McClain opined that Collier was capable of interacting with the public on an infrequent basis. (R. at 120.) She said that Collier likely would benefit from some infrequent assistance with setting realistic goals and/or making plans independently of others. (R. at 120.)

The ALJ was correct in noting that Burke's June 21, 2018, assessment of Collier's work-related abilities was based on his subjective complaints because Burke did not list any findings that supported her assessment. (R. at 517-19.) Under the regulations, the ALJ also may consider the relationship with the claimant of the source providing the opinion. *See* 20 C.F.R. §416.920c(c)(3)(i-v) (2020). Here, as noted by the ALJ, Fields is a consultative examiner who saw Collier only once. Also, the opinions of state agency psychologist McClain, as set out above, support not only the ALJ's consideration of the psychological opinion evidence, but also his finding as to Collier's mental residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's consideration of the physical opinion evidence or his physical residual functional capacity finding;

2. Substantial evidence exists in the record to support the ALJ's consideration of the mental opinion evidence and his mental residual functional capacity finding; and

3. Substantial evidence does not exist in the record to support the Commissioner's finding that Collier was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Collier's motion for summary judgment, deny the Commissioner's motion for summary judgment and remand the case to the Commissioner for further development.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed

findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    January 21, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE